**YORK COMMITTEE FOR A SAFE ENVIRONMENT et al., Petitioners,**

v.

**UNITED STATES NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,**

**Philadelphia Electric Company, Intervenor.**

**No. 74–1923.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1975.

Decided Dec. 9, 1975.

Raymond L. Hovis, York, Pa., for petitioners.

Herbert J. Martin, Atty., U. S. Nuclear Regulatory Com'n, with whom Wallace H. Johnson, Asst. Atty. Gen., Raymond M. Zimmet, Acting Sol., U. S. Nuclear Regulatory Com'n, and Edmund B. Clark and Larry G. Gutteridge, Attys., Dept. of Justice, were on the brief, for respondents. James A. Glasgow, Atty., U. S. Nuclear Regulatory Com'n, and Jacques B. Gelin, Atty., Dept. of Justice, also entered appearances for respondents.

Troy B. Conner, Jr., with whom J. Michael McGarry, III, Mark J. Wetterhahn, Washington, D. C., and Eugene J. Bradley, Philadelphia, Pa., were on the brief, for intervenor.

Before WRIGHT, TAMM and WILKEY, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

Petitioners seek review of a final decision of the Atomic Energy Commission [1] to grant a license to the Philadelphia Electric Company, intervenor here, for operation of a light-water-cooled nuclear reactor to be used for generating electricity.[2] The licensed reactor, which is now in operation, has a rated capacity of 1065 megawatts of electrical power [3] and is one of two such reactors [4] built by

---

1. The licensing and related regulatory functions of the Atomic Energy Commission were transferred to the Nuclear Regulatory Commission by the Energy Reorganization Act of 1974, Pub.L. 93–438, § 201(f), 88 Stat. 1233, 1243 (codified at 42 U.S.C.A. § 5841(f) (Supp. I 1975)).

2. The Commission's decision was in the form of a decision by an Atomic Safety and Licensing Appeal Board which became final when it was not reviewed or modified, on any issue raised in this proceeding, by the Commission. *See* 10 C.F.R. §§ 2.785, 2.786 (1975).

3. Brief for intervenor at 4 n.6.

4. The reactor for which a license was issued is known as Peach Bottom Unit 2. Although the Philadelphia Electric Co. sought a license for Unit 3 in the same proceeding, that application was severed for reasons not relevant here. The first reactor at Peach Bottom was experimental and has now been shut down. *Id.* at 4 n.5.

intervenor at its Peach Bottom Atomic Power Station located in York County, Pennsylvania, along the west shore of the Susquehanna River. Peach Bottom is approximately 38 miles northwest of Baltimore and 63 miles southwest of Philadelphia.

Petitioners have raised a host of objections to the Commission's procedures, interpretations of its own regulations, and findings of fact. We have considered each of these objections, and we find no flaws in most aspects of the Commission proceedings. We agree with petitioners, however, that the Commission appears to have followed a course inconsistent with its governing regulations which require licensees to keep the level of radioactive material, including radioactive iodine, in effluents released to unrestricted areas "as low as practicable." 10 C.F.R. §§ 20.1, 50.34a, 50.36a (1975). The regulations offer the following definition:

> The term "as low as practicable" as used in this part means as low as is practicably achievable taking into account the state of technology, and the economics of improvements in relation to benefits to the public health and safety and in relation to the utilization of atomic energy in the public interest.

10 C.F.R. § 50.34a.

At the time of the licensing proceeding for Peach Bottom, the regulations did not further specify the meaning of the qualitative standards set forth above.

The Commission had, however, issued an interim Regulatory Guide to "provide[] interim licensing guidelines to aid applicants in implementing §§ 20.1(c), 50.34a, and 50.36a of the Commission's regulations with respect to keeping radioiodine releases from light-water-cooled nuclear power reactors as low as practicable." U.S. Atomic Energy Commission Regulatory Guide 1.42 at 1.42–2, JA Vol. 9 Item 1. That Guide, which did not have the legally binding effect of a regulation and therefore could not modify the "as low as practicable" standard, stated, in essence, that the Commission's regulations were satisfied if the release of radioiodine from a reactor site [5] would result in a thyroid dose [6] of 15 or fewer millirems per year.[7] See id. at 1.42–4, 1.42–6, 1.42–9. Relying on this guidance, the Commission held that the expected radiation releases from the Peach Bottom site would be "as low as practicable." [8]

■ Petitioners contend that the Commission's regulations do not allow establishment of a numerical guideline whose satisfaction can be considered the equivalent of meeting the "as low as practicable" standard. Solely as a matter of interpreting the plain language of the Commission's definition of that standard, we agree. The Commission's definition, quoted above, requires consideration of health and safety effects, costs, the state of technology, and utilization of atomic energy in the public interest. While the

5. For the purpose of considering the acceptability of Peach Bottom's emission of radioactive materials, the Commission treated the application as if both Units 2 and 3, see note 4 supra, were being licensed. See Philadelphia Electric Co., RAI–73–9 at 730 (1973) (Nos. 50–277, 52–278), JA Vol. 4 Item 8 (initial decision).

6. Since iodine tends to concentrate in the thyroid, the maximum emission allowed is calculated in terms of the potential dose to the two-gram thyroid of a one-year-old child. The child is assumed to have a daily consumption of one liter of milk produced by cows who graze on the pasture nearest the reactor site boundary. See Philadelphia Electric Co., supra note 5 at 730; brief for intervenor at 28.

7. "The rem * * * is a measure of the dose of any ionizing radiation to body tissue in terms of its estimated biological effect relative to a dose of one roentgen (r) of X-rays. (One millirem (mrem) = 0.001 rem)." 10 C.F.R. § 20.4(c) (1975).

8. Philadelphia Electric Co., supra note 5, at 730, 741, 745; Philadelphia Electric Co., RAI–74–7 at 31–33 (1974) (Nos. 50–277, 50–278), JA Vol. 4 Item 12 (decision of Atomic Safety and Licensing Appeal Board). The Commission's conclusion that the Peach Bottom site's emissions would produce a maximum dose within the 15 millirem limit is well supported by the record.

last two factors may be constant for any reactor built or operating during a particular time period, the first two will presumably vary depending on the circumstances of each reactor. Since two of the four factors which determine whether radioactive emissions are "as low as practicable" are not constants, the Commission is precluded from determining that any particular positive level of emissions satisfies its requirement in all cases.

Our conclusion that the Commission's regulations do not permit establishment of a single numerical criterion under the "as low as practicable" standard is supported by the similar conclusion of a rule-making proceeding which was ongoing at the time of the Peach Bottom licensing proceeding and which has since been completed. That rule-making replaced Regulatory Guide 1.42 with an Appendix I to 10 C.F.R. Part 50. Appendix I establishes "Numerical Guides for Design Objectives and Limiting Conditions for Operation to Meet the Criterion 'As Low as Practicable' for Radioactive Material in Light-Water-Cooled Nuclear Power Reactor Effluents." 40 Fed. Reg. 19442 (1975). The numerical guide for radioiodine exposure is set at 15 millirems per reactor.[9] Appendix I also specifies, however, that *in addition* to satisfying the numerical guides,

> the applicant shall include in the radwaste system all items of reasonably

demonstrated technology that, when added to the system sequentially and in order of diminishing cost-benefit return, can for a favorable cost-benefit ratio effect reductions in dose to the population reasonably expected to be within 50 miles of the reactor. As an interim measure and until establishment and adoption of better values (or other appropriate criteria), the values $1000 per total body man-rem [10] and $1000 per man-thyroid-rem (or such lesser values as may be demonstrated to be suitable in a particular case) shall be used in this cost-benefit analysis.

*Id.* Thus the Commission recognizes in Appendix I that its "as low as practicable" standard requires individualized consideration of the costs and benefits of reducing radioactive emissions from any particular reactor below the numerical guidelines.

■ In this case it does not appear that such an individualized analysis was ever performed, and the Commission's decision did not rest on a finding that no further reduction in radioactive emissions would produce a favorable cost-benefit ratio. We therefore remand this case to the Commission in order to allow such an analysis to be performed.[11] Following the analysis, the Commission can determine in an appropriate proceeding [12]

---

9. Thus the numerical guideline in Appendix I would allow twice as much radioiodine emission from the Peach Bottom Atomic Power Station as the Commission found would actually be released. *See* note 5 *supra.*

[10.] A man-rem is

> [t]he summation of the environmental dose of radioactive effluents to the population. It is used to relate the radiation dose delivered to the general public resulting from reactor operations. This measure is the product of the dose delivered per unit time to an individual at a particular location multiplied by the number of individuals that spend their time at that location.

Brief for intervenor at x.

11. In performing this analysis, it would appear appropriate to use the benefit valuation established by Appendix I. Petitioners insist that

the costs of additional emission control equipment should be calculated as of the time of this court's decision in *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Comm'n,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). Brief for petitioners at 16–17. We find no merit in that contention. There might be a stronger argument that costs should be calculated as of the time of the initial or final licensing decisions in this case, rather than as of the time of the remand proceedings. Should the choice of the date for determining costs turn out to make a crucial difference, we believe it appropriate to leave that choice to the Commission in the first instance.

12. In the proceeding reviewed here the Commission held that once an applicant demonstrated that he met the numerical guidelines for the "as low as practicable" standard, the

whether to modify the operating license for the Peach Bottom reactors to require additional emission control equipment. *See* 10 C.F.R. § 50.109 (1975). Since the current level of emissions is low, the

burden of going forward shifted to opponents of the license to show that additional emission controls would be practicable. Philadelphia Electric Co., *supra* note 8, RAI–74–7 at 31; *see* Vermont Yankee Nuclear Power Corp., RAI–74–2 at 166–167 (1974) (No. 50–271). Whatever the justification for this holding, the terms of Appendix I do not require such a shift in the burden of proof. Moreover, since the information necessary to make the cost-benefit calculations will be readily accessible and comprehensible to the license applicant and the Commission staff but not to petitioners, placing the burden of going forward on petitioners appears inappropriate.

13. Petitioners raise three additional points which deserve brief comment. First, petitioners argue that the Commission erred in excluding from the licensing proceeding their contention relating to the cumulative impact of the radioactive emissions of all nuclear reactors in the general vicinity of Peach Bottom. The Atomic Safety and Licensing Board at first admitted this contention as it related to petitioners' contention that the radioactive discharges from Peach Bottom would not satisfy Commission regulations. Prehearing conference order of April 30, 1973, ¶¶ 5, 11 JA Vol. 4 Item 4. The Board reconsidered this order, however, and rejected petitioners' contention on the ground that Commission regulations are concerned with whether emissions from a particular reactor are as "low as practicable" and that the effects of discharges from other plants are irrelevant to that question. Order of May 25, 1973 at 3–4, JA Vol. 4 Item 6. The Atomic Safety and Licensing Appeal Board affirmed on the "narrow ground" that "radiation discharges from a distant facility are not relevant to the issue of whether the discharges from a separate facility comply with [the "as low as practicable"] requirement." Philadelphia Electric Co., *supra* note 8, RAI–74–7 at 25. The Appeal Board properly noted that this narrow holding did not mean that cumulative radiation effects would never be relevant to the question of licensing a particular reactor and instructed the Commission staff to

> review existing regulatory guidance to assure that an acceptable approach exists for the consideration of the radiological safety and environmental effects of cumulative radioactive discharges from nuclear facilities not at the same site but which nevertheless are in such proximity that such effects should not be ignored.

public interest does not require the operating license to be suspended during the pendency of the remand proceedings.[13]

*So ordered.*

The Licensing Board here admitted as a matter in controversy petitioners' contention that the cumulative effect of chemical discharges from Peach Bottom and another reactor in the area would have a deleterious impact on the aquatic environment. The Board also ruled, however, that petitioners, "as proponents of this contention, have the burden of proof under § 2.732 of the Commission's Rules of Practice, 10 C.F.R. Part 2, to establish that there are in fact cumulative chemical effects." Order of May 25, *supra* at 5. The Appeal Board interpreted this ruling as placing the burden of going forward to show cumulative chemical effects on petitioners, and on that basis it sustained the Licensing Board. Philadelphia Electric Co., *supra* note 8, at 26. We agree with petitioners that this allocation of the burden of proof is unjustified. 10 C.F.R. § 2.732 places the burden of proof on "the applicant or *the proponent of an order * * *.*" (Emphasis added.) Petitioners' suggestion that there might be harmful cumulative chemical effects which the Licensing Board should take into account did not make them proponents of an *order.* Nevertheless, the Commission's error in this regard is harmless since the Licensing Board specifically found that "the cumulative effects of the discharge from [the other reactor] with the discharge from the Peach Bottom facility not only will not be significant but cannot be expected to be detectable." Philadelphia Electric Co., *supra* note 5, at 732. This finding is adequately supported by the record.

Finally, petitioners challenge the Commission's rejection of their request for financial and technical assistance. The Commission's response to that challenge is that it is currently reconsidering the question of financial assistance—including the question of retroactive assistance—and that "[p]etitioners' request for financial assistance is therefore still not foreclosed." Brief for respondents at 35. We therefore do not reach petitioners' contention that they are entitled to assistance from the Commission because of their participation in the proceedings reviewed here, nor do we express any views regarding financial assistance during the remand proceedings. We note, however, that it would be unrealistic to expect public interest litigants to underwrite the expense of mounting the kind of preparation and presentation of evidence that is ordinarily required in this type of case.